**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Rebecca Banner,

                                        **Case No. C2-04-1099**

         **Plaintiff,**                       **JUDGE GREGORY L. FROST**

                                        **Magistrate Judge Kemp**

    **v.**

Trustmark Insurance Co. et al.,

         **Defendants.**

## OPINION & ORDER

       This is an Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et*

*seq.*, case.  Presently before the Court are cross motions for judgment on the administrative

record.  (Docs. # # 26, 27).  The motions are fully briefed and the Court now turns to an

examination of the issues those motions present.

## BACKGROUND

       CoreSource[1] employed Plaintiff Rebecca Banner ("Banner") as a nurse care manager

from November 18, 2002 to September 22, 2003.  (AR[2] 179-180; Doc. # 21 ¶ 6; Doc. # 16 ¶ 8[3]).

---

      [1] CoreSource is a Defendant.  Trustmark moves to dismiss CoreSource as a defendant in its motion for judgment on the administrative record.  (Doc. # 26 at 10).  In her memorandum in opposition to Trustmark's motion for judgment on the administrative record, Banner attempts to stipulate to a dismissal of all of her claims against CoreSource.  (Doc. # 16, Doc. # 29 at 9).  The Court shall treat this as a Fed. R. Civ. P. 21 motion.  The motion is **GRANTED**, and it is **ORDERED** that CoreSource is dismissed from this action as a defendant.

      [2] "AR" denotes Administrative Record.

      [3] The last day Banner worked was June 9, 2003.  Her employment did not terminate until September 22, 2003.  (Doc. # 21 ¶ 6; Doc. # 16 ¶ 8).

By virtue of her employment with CoreSource, Banner was eligible to participate in

CoreSource's short term disability plan ("Plan").  Banner took advantage of that opportunity and

enrolled in the Plan.   Defendant Trustmark ("Trustmark") was the Plan Administrator and paid

all benefits due under the Plan.  (AR 6, 26, 40, 57).

CoreSource's job description for a case manager provides that such an employee "serves

as the liaison between a patient, the primary care physician and other providers in the health care

community and coordinates and monitors the entire range of health care needs of the patient."

*Id.* at 173.  The document states that case managers are "required to sit; use hands to finger,

handle, or feel objects, tools, or controls; required to reach with hands and arms; vision abilities

include close vision, distance vision and the ability to adjust focus."  *Id.* at 174.  The description

further indicates that reasonable accommodations will be made to enable individuals with

disabilities to perform the essential functions.  *Id.* at 175.

## I.    TERMS OF THE PLAN

The Plan provided:

> Disability (Disabled): You are Disabled if:
> - You are unable, due to sickness or Injury, to do the substantial and material duties of Your regular job; and
> - You are not doing any other work for wage or profit. Disability starts on the date of the first treatment for the Disability.  The first treatment may be given by a Physician; or by a registered nurse (R.N.) who is in the employ of the employer.
>
> Disability is considered to continue, and the Weekly Benefit will be paid, only while You are under the care of a Physician for the cause of the Disability.  The Physician must state in writing that You continue to be Disabled.

(AR 33).

2

The Plan defined "Physician" as a "duly licensed physician or surgeon who is acting within the scope of his license." *Id.* In addition, the Plan specified that benefits would be paid "while the Disability continues or to the end of the Maximum Period, if earlier." *Id.*

The Plan requires participants to provide Trustmark with Notice of a Claim. (AR 37). Once Trustmark receives the Notice, Trustmark sends the participant a claim form. *Id.* Participants must then forward "Proofs of Loss" to Trustmark. *Id.* Specifically, regarding "Proofs of Loss," the Plan mandates:

> When the plan outline provides for periodic payment for a continuing loss, written proof of loss must be given to The Plan within 90 days after the end of each period for which The Plan is liable. For any other loss, written proof must be given within 90 days after such loss. If it was not reasonably possible to give written proof in the time required, The Plan will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be given no later than 1 year from the time specified unless the claimant was legally incapacitated.

*Id.*

Furthermore, the Plan permitted Trustmark to require a claimant provide The Plan "information in addition to the proof of loss to determine benefits payable. Any cost associated with providing this information is the responsibility of the Covered Person." *Id.* at 38.

## II.   BANNER'S INJURIES

Banner's suffered a back injury in 1977 while carrying her son in a back pack. (Doc. # 27 at 3). Neurosurgeon Dr. James Barnes ("Barnes") concluded that Banner had a herinated disk and performed a laminectomy and disk excision. (AR 95, 249). Banner returned to Barnes in 1982 after she re-injured her back while water skiing. *Id.* Barnes then performed another

3

laminectomy.  *Id.*

Subsequently, Barnes retired and Dr. J. P. Martz ("Martz") began treating Banner in 1991 when she complained of leg pain.  *Id.*  Martz performed a diskectomy; however, Banner was diagnosed with post-laminectomy syndrome and arachnoiditis six (6) weeks after the surgery. *Id.* Several years later, in 1994, Banner fell out of her husband's semi-tractor truck and sustained a fracture of her first lumbar vertebra.  *Id.* at 96.  No surgery was required for that injury.

Dr. Janet Bay ("Bay"), a neurologist, began treating Banner in 1994.  *Id.* at 185.  Banner had an appointment with Bay on February 12, 2002 to discuss Banner's pain in her right arm.  *Id.* Bay examined Banner and concluded that Banner had a full range of motion in her neck, preserved reflexes, and sensory and strength testing were intact.  *Id.*  Bay prescribed Ultram for Banner, noting that Banner had improved while on that medication.  *Id.*  Bay ordered an MRI and electromyogram ("EMG") for Banner.  *Id.*

Dr. Albert Berarducci ("Berarducci") conducted those tests on April 2, 2002 to rule out "radiculopathy vs. plexopathy."  *Id.* at 188.  Berarducci's report indicated that Banner's EMG was normal and that there was "no definite electrical evidence of cervical radiculopathy, brachial plexopathy or mononeuropathy."  *Id.* at 189-190.

Banner returned to Bay's office on August 6, 2002 to address Banner's low back pain. Bay noted that Banner had begun feeling better after completing physical therapy.  *Id.* at 184.

Dr. Bruce Auerbach ("Auerbach") had an echocardiogram performed on Banner on December 14, 2002.  *Id.* at 192.  The test results were normal.  *Id.*

In late January 2003, Banner checked into St. Ann's Hospital because of vision problems. *Id.* at 196, 199.  Banner reported that she had suffered several episodes of "visual changes as

though she was looking [through] binoculars." *Id.* at 196.  Banner did not suffer any vision problems once in the hospital.  *Id.*  The results of blood tests, a CT of the brain, a MRI, and an EKG were normal.  The attending physician diagnosed her with "episodic visual changes" and noted her blood pressure was well-controlled by her medications.  *Id.* at 194, 199.

Banner returned to Bay's office on February 4, 2003.  *Id.* at 183.  At that time, Banner was complaining of chronic low back and neck pain.  *Id.*  Bay kept Banner on Lortab four times a day for pain.  Bay additionally noted that Banner's "chronic pain in her tailbone and lower back

. . . is fairly well controlled on Lortab."  *Id.* at 186-187.

Banner met with Dr. Kevin Schroeder ("Schroeder") on March 31, 2003 as a follow-up to her January hospitalization.  *Id.* at 199.  Her chief complaint at that time was fatigue.  *Id.*  Schroeder reviewed Banner's entire medical history and noted that Banner began experiencing high blood presssure when she gained sixty (60) to eighty (80) pounds.  *Id.*  Schroeder noted that the test results on Banner's hypertension were all negative.  *Id.*

Banner experienced chest pains on June 9, 2003 and checked into a hospital that same day.  *Id.* at 201.  Auerbach examined Banner and noted that her blood pressure was fluctuating, but that her CVP was normal and that there was no edema.  *Id.* at 200-201.  Auerbach noted that Banner's carotid, pulse, lung and cardiac examinations were normal, and her abdomen was benign.  *Id.* at 200-201.  Her test results were unremarkable.  *Id.* at 200.  Auerbach doubted that Banner had "acute coronary syndrome."  *Id.*  He discharged her the next day, after diagnosing her with chest pain, ASHD, accelerated hypertension, and a history of TIA and ordering her to continue taking her previously prescribed medications.  *Id.* at 201.

5

Banner applied for short-term disability benefits on June 17, 2003.  *Id.* at 171.  She

attached an attending physician statement from Bay dated June 19, 2003 to her claim for

benefits.  *Id.* at 172.  In that statement, Bay diagnosed Banner with chronic low back and neck

pain.  *Id.*  Bay's restrictions included no lifting, pulling, or pushing.  *Id.*  Bay noted that Banner

was disabled from June 9, 2003 to June 30, 2003.  *Id.*

Banner returned to Bay's office on June 19, 2003.  *Id.* at 182.  During that visit, Banner

complained of neck and joint pain.  *Id.*  Bay refilled Banner's prescription for Lortab and noted

that Banner had an appointment to see a rheumatologist the following week.  *Id.*

Banner had an MRI of her lumbar spine on August 22, 2003.  *Id.* at 218-219.  Dr. Robert

McGhee reviewed the test results and stated:

> There is a focal kyphosis centered at the L1 level.
> Alignment is otherwise normal.  The overall spinal canal diameter
> is within normal limits.  There is multilevel disk desiccation and
> degeneration, primarily involving T12-L1, L1-2, L4-5, and L5-S1.
> At the L1 level, there is a relatively severe chronic-appearing burst
> fracture of the vertebral body.  There is complete collapse of the
> vertebral body centrally.  There is displacement of bone towards
> the spinal canal with secondary focal canal narrowing.  The sac
> measures a centimeter or so in AP dimensions.  The adjacent conus
> is surrounded by CSF.

*Id.* at 219.  McGhee concluded that Banner had a "chronic-appearing burst fracture at L1 with

focal kyphosis and deformity of the canal."  *Id.*

## III.  TRUSTMARK'S DECISIONS

Trustmark denied Banner's claim on September 9, 2003.  *Id.* at 130.  Trustmark's letter to

Banner informing her of its decision stated that Trustmark had reviewed Banner's entire file and

determined that the medical documentation did not "document restriction and limitations that

would prohibit [Banner] from performing the substantial and material duties of [her] occupation

6

as a RN-Case Manager." *Id.*

Banner had an appointment with neurosurgeon Dr. John McGregor ("McGregor") on September 16, 2003. *Id.* at 245. McGregor noted that Banner's chief complaint was chronic back pain. *Id.* He examined Banner's MRIs and recommended a comprehensive pain management program for her. *Id.* at 246.

Banner filed her appeal on September 30, 2004 but did not file any supporting documentation until February 27, 2004. *Id.* at 116, 124. That documentation included Banner's records from Bay, Dr. John Horn, McGregor, Mount Carmel Hospital, St. Ann's Hospital, and the Ohio State University Pain Control Center. *Id.* at 116. In addition, Banner forwarded to Trustmark a vocational assessment that was completed by Rehabilitation Counselor Caroline Wolfe ("Wolfe") on January 20, 2004. *Id.* Wolfe reviewed Banner's medical records and determined that Banner was "not capable of sustained remunerative employment in any position." *Id.* at 120. Banner also included the notice of her awards of social security disability benefits from the Social Security Administration from 1991 forward. *Id.* at 95, 105, 116.

Trustmark then retained Dr. Alan Ehrlich ("Ehrlich") to review Banner's file, which included her medical and social security records. *Id.* at 105-113. Ehrlich considered Banner's file and concluded on March 30, 2004 that Banner's recovery from her hospitalization for chest pain supported a finding of temporary disability from June 9, 2003 to June 30, 2003. *Id.* at 112. Ehrlich diagnosed Banner with chronic low back and neck pain and continued by noting that the few records he had documenting Banner's post-hospital office visits "indicate ongoing problems with neck and back pain, but it is unclear that these would prevent her from doing a sedentary job." *Id.* at 108, 112. Ehrlich commented:

The vocational assessment indicates that she was having problems with having to sit all the time but it is unclear from the job description that she is not able to get up and change position on an as needed basis.  It is unclear why she stopped working when she did and did not return to work.  With respect to her blood pressure, it is actually under fairly good control and her chest pain is felt to not reflect coronary disease at this point in time.  Although she undoubtedly still has neck and back pain, she has had these for close to 10 years now and it is unlikely that they will ever go away.  There is no evidence in the records that being at her job makes them worse.

Her restrictions would be as outlined by Bay, which include no lifting, pushing, or pulling.  In addition, based on the additional information in the file, it would be reasonable for her to be able to change positions as needed.  She might need a period of part-time work to help her back into the work force.  I do think a sedentary position is most appropriate for her and that is the nature of the job in question.  The vocational assessment alleges that she has volatile malignant hypertension, but this appears to be under control.  It alleges that her blood pressure problems were a factor in her being unable to work, which is not supported, in the medical records.  It alleges that she cannot tolerate any stress or tension as it raises her blood pressure and this is not supported in the medical records either.  There is no documentation in the medical records that her work is unusually stressful for her or is contributing to her blood pressure problems.

I think obtaining an [Independent Medical Examination ("IME")] may be appropriate.  Unfortunately, the Vocational Assessment performed appears to contain a number of factual errors and in my opinion the evaluator does not accurately state certain critical issues. . . . [Bay's Attending Physician Statement] indicated that [Banner] was able to return to work as of 7/1/03, which is not addressed by the vocational assessor.  I also note that [sic] vocational assessor appears to be more of an advocate for [Banner] as opposed to rendering an objective assessment when she uses phrases such as 'tried valiantly to find a position.'  Because of all of the above I have difficulty finding [Wolfe's] conclusions valid.  Thus I would support getting an additional opinion regarding [Banner's] status. . . .It should also be noted that . . . there is no objective measurement of her capabilities contained in any of the files reported to me.

*Id.* at 112-113.

On April 10, 2004, Trustmark informed Banner via letter that it was granting her benefits

8

for the period of June 10, 2003 to June 30, 2003 on the basis of chest pain.  *Id.* at 105-106.

Because Banner's medical file indicated neck and back pain, the letter further informed Banner

that Trustmark was scheduling Banner for an IME to "determine the precise basis of the

impairment." *Id.* at 105.  The IME was intended to aid Trustmark in its decision on Banner's

eligibility for benefits after June 30, 3003.  *Id.* at 106.

Orthopaedic surgeon Dr. Richard Briggs ("Briggs") completed the IME on May 18,

2004.  *Id.* at 95-98, 103-104.  Banner indicated that her chief complaint at that time was pain in

her legs and lower back.  *Id.* at 95.  Briggs reviewed Banner's medical records, job description,

test results, and also physically examined her.  *Id.* at 96-97.  The physical examination revealed

that Banner moved well and had a full range of motion in her hips and her knees.  *Id.* at 96.

Banner moved well and ambulated without a limp.  *Id.*  She did have a limited range of motion in

her back.  Briggs concluded:

1.  Ms. Banner does have difficulty sitting for any length of time such as beyond 20 to 30 minutes but is relieved by standing, changing positions, and moving about. This would occur whether at work or at home.
2.  If she was allowed to get up and change positions from time to time as needed, her ability to function at a sedentary occupation would be adequate.
3.  It is difficult for me to clarify precisely where her most significant impairment is situated.  It would seem that she does have objective findings . . . that would indicate the multi-level degenerative changes of her lumbar spine as well as the burst fracture. . . . The cardiac status based on the echocardiogram . . . and Dr. Auerbach's report of June 9, 2003 would place cardiac origin low on my list.
4.  All things considered I am of the opinion that Ms. Banner is capable of returning to sedentary work, at least part-time initially, if allowed to accommodate her knees for sitting, changing positions, moving about and resting from time to time. My opinions are based on a reasonable degree of medical certainty and are based on my training and experience as a board certified orthopaedic surgeon.

*Id.* at 97-98.

Briggs supplemented his report on July 2, 2004 to clarify what he meant by using the

phrase "moving about."  Specifically, Briggs stated that "moving about" meant:

> not being strictly confined to a chair with the knees flexed for eight
> hours at a time or even four hours at a time but to take the
> opportunity each hour to stand, stretch, walk about the desk, have a
> trip to the water cooler or to the bathroom and that should be
> sufficient to maintain reasonable comfort of her knees.

*Id.* at 93.

On August 4, 2004, Trustmark sent Banner a letter informing her that Trustmark had

determined that she was not eligible for short term disability benefits under the Plan after June

30, 2003.  *Id.* at 90.   In reaching that conclusion, Trustmark considered Banner's entire file and

the IME.  *Id.* at 91.  Trustmark's letter stated that her leg and lower back pain was relieved by

standing, changing positions, and moving about.  *Id.* at 90.  Trustmark noted that Briggs had

concluded that Banner was able to work in a sedentary position if accommodations for sitting,

changing positions, and moving about were allowed.  *Id.*  Accordingly, Trustmark contacted

CoreSource who informed Trustmark that it would make such accommodations available for

Banner.  *Id.*

## IV.  THE CURRENT ACTION

Banner instituted this action on November 18, 2004.  (Doc. # 1).  Her Amended

Complaint alleges that Trustmark violated § 502(a) of ERISA, 29 U.S.C. § 1132(a)(1)(B).  (Doc.

# 16 at ¶ 16).  That section provides "[a] civil action may be brought by a participant or

beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The

purpose of § 502(a) is to provide beneficiaries with a cause of action to enforce their ERISA

contracts.

Banner seeks relief in the form of disability benefits according to the terms of the Plan from the time she became disabled and thereafter for 26 weeks; reimbursement for disability benefits not paid from the time she became disabled and for 26 weeks thereafter; pre-judgment and post-judgment interest; restoration of all benefits lost as a result of Trustmark's decision that she was not temporarily disabled under the plan; and attorney's fees and costs. (Doc. # 16 ¶ ¶ A-G). Both parties have filed motions for judgment on the administrative record pursuant to *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).

## STANDARD OF REVIEW

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 505-506 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If the plan provides the administrator with discretion then "the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998). Trustmark has the burden of proving that the Plan expressly provides it with such discretion. *Brooking v. Hartford Life & Accident Ins. Co.*, No. 04-6478, 2006 U.S. App. LEXIS 3830, *8 (6th Cir. 2006). Banner urges the Court to apply the *de novo* standard. (Doc. # 27 at 10; Doc. # 29 at 3).

The Sixth Circuit does not require a plan to use certain magic words to create discretionary authority for a plan administrator in administering the plan. *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 at n.2 (6th Cir. 1992). Yet the Sixth Circuit does insist upon "a clear

11

grant of discretion [to the administrator]" before replacing *de novo* review with the arbitrary and capricious standard.  *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994).

According to Trustmark, the relevant plan language that establishes the arbitrary and capricious standard of review is appropriate provides "the Plan has the right to require the Covered Person to provide The Plan information in addition to the proof of loss to determine benefits payable."  (Doc. # 26 at 11 citing AR 38).  That sentence appears under the heading "General Provisions" and the subheading "Records, Physical Examination, and Autopsy."   (AR 38).

Trustmark fails to satisfy its burden.  That is, the quoted language fails to establish that the Plan clearly grants discretion to Trustmark.  Indeed, the language at issue does nothing more than require the claimant to provide additional information if requested.  Nothing in the quoted language provides Trustmark with a "clear grant of discretion."  Thus, the Court will employ the *de novo* standard of review.

The Sixth Circuit defines *de novo* as "without deference to the decision or any presumption of correctness, based on the record before the administrator."  *Perry v. Simplicity Eng'g, Div. of Lukens Gen. Indus.*, 900 F.2d 963, 966 (6th Cir. 1990).  When a court reviews a decision *de novo*, it simply decides whether it agrees with the decision under review.  *Id.*

The Court is required to consider only the facts known to the plan administrator at the time the final decision was made to deny benefits.  *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-379 (6th Cir. 2005); *see also Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).  In this case, that date is August 3, 2004.  *Moon*, 405 F.3d at 379; (AR 90-91).

## DISCUSSION

### I.     FACTORS IN ANALYSIS

Banner asserts that the Court should take into account two factors in determining whether Trustmark's denial of benefits satisfies the *de novo* standard of review, including: (1) Trustmark's conflict of interest; and (2) the Social Security Administration's award of benefits to Banner.  (Doc. # 29 at 3, 8; AR 679-1285).  The Court will address each of these issues separately.

#### 1.     Conflict of Interest

Banner asserts that there is a conflict of interest because Trustmark is the Plan Administrator and the payor of benefits under the Plan.  (Doc. # 29 at 3).  Trustmark fails to argue with Banner's assertion, and it appears to the Court that Trustmark serves both capacities. (Docs. # # 26, 28; AR 6, 57).  Thus, the Court concludes that a conflict exists.  *See Killian v. Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 521 (6th Cir. 1998).

In this situation, the Sixth Circuit advises that the conflict does not alter the standard of review.  *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005).  Rather, the existence of a conflict merely becomes a factor in the Court's review of Trustmark's decision to deny Banner's short term disability benefits after June 30, 2003.  *Calvert v. Firstar Fin*., *Inc*., 409 F.3d 286, 292 (6th Cir. 2005) (citing *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000)).

#### 2.     Social Security Disability Determination

13

Banner posits that Trustmark failed to consider the Social Security Administration's ("SSA") determination that Banner was disabled in 1991.  (Doc. # 29 at 8-9; AR 679-1285).  Trustmark's letter to Banner informing her of its decision to deny her second appeal specifically mentions "medical information received."  Banner's medical records included her SSA file.  (AR 90-91, 116).  This conclusively establishes that Trustmark did consider the SSA's determination.

The Court is compelled to note, however, that the SSA's determination does not, standing alone, require the Court to disagree with Trustmark's decision to terminate Banner's short term disability benefits.  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  The SSA determination to award benefits to Banner is, instead, just one factor the Court should consider in the context of the record as a whole, in determining whether Trustmark's contrary decision satisfies the *de novo* standard.  *Id.*

## II.    TRUSTMARK'S DENIAL OF BANNER'S BENEFITS AFTER JUNE 30, 2003

Banner contends that she is eligible for short term disability benefits under the Plan.  (Doc. # 27 at 2; Doc. # 29 at 4).  Conversely, Trustmark maintains that its decision to deny her such benefits after June 30, 2003 satisfies the *de novo* standard of review because the records it had indicated that Banner did not satisfy the Plan's definition of disabled.  (Doc. # 26 at 12-14; Doc. # 28 at 2-7).

The central issue is whether Banner's evidence satisfies the Plan's definition of disability.  Again, disability exists under the Plan when Banner is:

- unable, due to sickness or Injury, to do the substantial and material duties of [her] regular job; and
- not doing any other work for wage or profit.  Disability starts on the date of the first treatment for the Disability.

14

> The first treatment may be given by a Physician; or by a registered nurse (R.N.) who is in the employ of the employer.
>
> Disability is considered to continue, and the Weekly Benefit will be paid, only while [Banner is] under the care of a Physician for the cause of the Disability.  The Physician must state in writing that [Banner] continues to be Disabled.

(AR 33).

Having carefully reviewed the Administrative Record and the parties' briefs submitted in support of their cross-motions for judgment on the administrative record, and considering the conflict of interest present in this case as well as the SSA determination, the Court holds that it agrees with Trustmark's decision to deny Banner's claim for short term disability benefits after June 30, 2003.  First, none of the doctors that examined Banner after June 30, 2003 stated that she was "unable to do the substantial and material duties of [her] regular job."  Second, none of those doctors seemed to agree about what Banner's chief aliment was.  Third, none of the physicians who examined Banner stated in writing that she continued to be disabled after June 30, 2003.  Fourth, Bay noted that Banner's pain was well-controlled with medication.  *Id.* at 185-198.  Along those lines, Banner did not complain that her medication prevented her from doing her job or that her job made her ailments worse.   Fifth, Berarducci, Auerbach, and Schroeder each administered a variety of tests, and each test came back normal.  *Id.* at 188-190, 192, 194, 199, 200.  For the foregoing reasons, the Court agrees with Trustmark's decision.

Banner's reliance on Wolfe's report does nothing to change the Court's conclusion for two reasons.   Wolfe is not a medical doctor.  In addition, Wolfe's report is riddled with errors that cast her recommendation in doubt.  *Id.* at 108-113.  As such, Banner fails to satisfy the Plan's definition of disabled.

<u>**CONCLUSION**</u>

Banner's motion for judgment on the record is **DENIED**.  (Doc. # 27).  Trustmark's motion for judgment on the record is **GRANTED**. (Doc. # 26).  The Clerk shall enter judgment accordingly and shall terminate this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division, at Columbus.

**IT IS SO ORDERED.**


    **/s/   Gregory L. Frost**

**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**

16